UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

JANET SOLNIN,

                      Plaintiff,                            **MEMORANDUM**
                                                          **AND ORDER**
     -v.-                                       03-CV-4857 (DRH) (ARL)

GE GROUP LIFE ASSURANCE COMPANY
and PHOENIX LIFE INSURANCE COMPANY,

                      Defendant.
_____

**Appearances:**

**For the Plaintiff:**
**TRYON & PASCALE, P.C.**
19 Beech Street
Garden City, New York 11530
By: Michael D. Tryon, Esq.

**For the Defendants:**
**CHORPENNING, GOOD, CARLET & GARRISON**
645 Fifth Avenue - Suite 703
New York, New York 10022
By: Michael J. Zaretsky, Esq.

**HURLEY, Senior District Judge:**

                Plaintiff Janet Solnin ("Plaintiff") brings this action challenging the termination

of long-term disability benefits under her employer's benefit plan. Defendants GE Group Life

Assurance Company ("GE Group Life") and Phoenix Life Insurance Company ("Phoenix Life")

(collectively, "Defendants") have moved for summary judgment pursuant to Federal Rule of

Civil Procedure ("Rule") 56. For the reasons stated below, the motion is granted in part and

denied in part, and the matter is remanded for proceedings consistent with this opinion.

# BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1

Statements, are undisputed unless otherwise noted.

### *Plaintiff's Injury at Work*

Plaintiff was employed as an Assistant Manager for Reliance Federal Savings

Bank ("Reliance").  On November 18, 1998, Plaintiff suffered a back injury at work when she

crawled underneath a table to fix a computer.  On February 13, 1999, she filed a Notice of Claim

for Disability Benefits under the disability insurance policy (the "Policy") provided by Reliance;

her application was filed on July 26, 1999.  The Policy was originally administered by Phoenix

Life until April 2000, when GE Group Life acquired the group life and health operation of

Phoenix Life and thereafter became the new Administrator.

### *The Policy*

A Group Policy and Long Term Disability Certificate were issued by Phoenix

Life to Reliance which provided for long-term disability benefits.  The Policy is an employee

welfare benefit plan governed by the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001 et seq.  The Policy defines "Total Disability" and "Totally

Disabled" as:

> 1.    During the Elimination Period and the following 24
>       months, you are unable to perform all the material and
>       substantial duties of your regular occupation.
>
> 2.    After the Elimination Period and the following 24 months,
>       you are unable to perform the duties of Any Occupation.

### *Plaintiff's Application for Long-term Disability Benefits/The Medical Evidence*

Plaintiff's application for benefits included a Health Care Provider's Statement

executed by Barry G. Fisher, M..D. who noted a diagnosis of "Herniated Disc Lumbar Spine." On her application, Plaintiff noted that she would be receiving Worker's Compensation for the period February 5 through May 21, 1999, and that she had been unable to work because of her disability since February 5, 1999. The Attending Physician's Statement submitted with the application was signed by Thomas M. Mauri, M.D., Plaintiff's treating physician, who noted a diagnosis of thoracic disc herniations with spinal cord symptoms.

In a letter dated April 14, 1999, Dr. Mauri noted, inter alia, that Plaintiff immediately developed back pain following her injury and "over the ensuing weeks, developed significant lower extremity numbness and later weakness. On January 15, 1999, she had the first episode of shocks going down her left leg and then her left leg and foot collapsed under her and she fell. . . . . She walks better with a cane and especially using a shopping cart." (R. at 755.)[1] In the section entitled "Recommendations", Dr. Mauri noted that Plaintiff seemed to be progressing and had less pain and symptoms than she had a month earlier. He encouraged her to continue treatment, restart an anti-inflammatory and to continue therapy three times a week for at least another six to eight weeks. (*Id.*)

In a letter dated June 1, 1999, Dr. Mauri noted that Plaintiff continued to improve with less loss of sensation, that a neurological examination was normal, but noted that her thoracolumbar pain persisted. (*Id.* at 757.) He further stated that he did not think surgical intervention was necessary at this time but that she "continues to be totally disabled at this time because of her back pain. I am not sure that she will ever be able to return to work as a bank manager given the job description that she gave me." (*Id.*)

---

[1] References to R. refer to the administrative record filed in this case.

Phoenix Life also received a copy of a letter dated February 25, 1999 from Jeffrey Mallin, M.D., a neurologist, to Roger Gittelson, M.D., in which Dr. Mallin noted Plaintiff's complaints of numbness, tingling, and shivering in her legs. (*Id.* at 719.) Plaintiff complained that she had difficulty walking and that her left leg tended to buckle if she put too much weight on it. (*Id.*) Dr. Mallin concluded that Plaintiff was experiencing a "bona fide loss of motor strength" and that she "should be evaluated for possible neurosurgical intervention." (*Id.* at 720.) He noted that Plaintiff was taking several medications, including Valium, the latter of which he instructed her to reduce her dosage. (*Id.*)

Phoenix Life received a letter from Allen D. Efron, M.D., a nuerosurgeon, dated March 1, 1999, addressed to Dr. Mallin, who apparently referred Plaintiff to Dr. Efron. (*Id.* at 733.) Dr. Efron noted Plaintiff's complaints of pain and numbness and her alleged inability to walk for long periods without stopping to rest. (*Id.* at 734.) He concluded that he was "unsure as to what to attribute [Plaintiff's] symptoms" and that he did not think surgery was appropriate given the "lack of objective evidence of spinal cord compression, a lack of thoracic radicular findings and the minimal disc herniation." (*Id.*)

Office notes from Dr. Ralph Parisi dated March 25, May 4, June 29, and August 10, 1999 were also submitted to Phoenix. (*Id.* at 713-16.) On March 25, 1999, Dr. Parisi noted that Plaintiff was unable to return to work. (*Id.* at 716.) On May 4, 1999, Dr. Parisi noted that Plaintiff was improving and had less paresthesias.[2] (*Id.* at 715.) On June 29, 1999, Dr. Parisi noted that Plaintiff had chronic complaints of numbness in the left leg with difficulty walking but

---

[2] An abnormal sensation such as burning, prickling, tingling or tickling. Stedman's Medical Dictionary 1316.

that there was "a paucity of objective findings." (*Id.* at 714.) Finally, on August 10, 1999, Dr.

Parisi noted that Plaintiff's MRI showed a S1 nerve root problem, that Plaintiff's condition was

"somewhat improved in terms of her strength but she continues to have persistent paresthesias

down the left leg with a restriction of spine motion." (*Id.* at 713.)

Phoenix also received the notes and records of Dr. Melvin Holden. (*Id.* at 659-

710.) Among other things, Dr, Holden noted that Plaintiff reported numbness in her legs and an

unsteady gait. (*Id.* at 688.)

Records from Dr. Erik Entin, a neurologist, were also reviewed. (*Id.* at 647-59.)

These records reflect the results of a MRI, noted on January 29, 1999, as an Impression of "T7-9

left paracentral disc herniation" (*id.* at 648), and the results of a MRI of the Cervical Spine, noted

on February 11, 1999, which included an impression of "[m]inimual degenerative change," (*id.*

at 649).

### *Plaintiff's Claim for Long-Term Disability Benefits is Approved*

By letter dated August 31, 1999, Phoenix Life notified Plaintiff that her claim for

long-term disability benefits had been approved. (R. at 641-43.) Plaintiff was advised that the

benefits payable under the Policy were to be coordinated with certain other income benefits she

was entitled to receive, including Social Security benefits and Workers' Compensation benefits.

Plaintiff began receiving such benefits commencing with the period August 4 through August

31, 1999. (*Id.* at 613.)

### *Workers' Compensation Board Decision*

On January 11, 2000, the Workers' Compensation Board issued a Memorandum

and Decision awarding Plaintiff benefits of $320.51 per week beginning May 21, 1999. Pursuant

to the Policy, Phoenix Life re-calculated the long-term disability benefits it had paid to offset the Workers' Compensation award.

***Updated Medical Records***

Phoenix Life received updated medical records from Dr. Mauri in July 2000.  (*Id.* at 526-546.)  Among them was a report dated March 2, 2000, in which Dr. Mauri noted that Plaintiff "is going to suffer with the residual of her injuries to her thoracic spine for the rest of her life.  I have discussed with her the possibility of having surgery for the thoracic disc herniation but she has chosen to continue suffering with the pain rather than take the risks of the surgery and certainly this is her option."  (*Id.* at 544.)  There also was a report dated June 1, 2000, in which he noted, inter alia, that Plaintiff still had restricted range of motion in the thoracic area, she continued to suffer with the effects of a thoracic herniated disc with spinal cord irritation, he recommended that she continue physical therapy three time per week, and that she remains totally disabled from any kind of work because of the severity of her injury.  (*Id.* at 545.)  Finally, there are multiple comments throughout his notes regarding Plaintiff's inability to walk more than a few minutes without weakness on her left side, her difficulty reaching, bending, and twisting, and that she continues to suffer significant left leg symptoms.  (*See generally id.* at 526-46.)

***Change in Eligibility for Benefits***

By letter dated March 28, 2002, GE Group Life, which was now the Administrator of the Policy, advised Plaintiff that the definition of "Total Disability" had changed from the inability to perform her own occupation to the inability to perform any occupation because the 24-month disability period had expired.  (*Id.* at 2566-2570.)  Plaintiff

was notified that additional medical information, not yet received from her, was required. In that regard, the letter noted that additional benefits could not be considered until the requested information was received and reviewed. (*Id.* at 2568-2570.)

That same day, GE Group Life received a Supplemental Statement of Disability from Plaintiff, an Attending Physician's Supplemental Statement from Dr. Mauri, and a medical report of Dr. Mauri, dated January 28, 2002. (*Id.* at 2558-2564.) In her Supplemental Statement dated March 14, 2002, Plaintiff stated that she "can't walk that much and at times [her] legs have no feeling and [she] fall[s]. [She] need[s] help around [her] home." (*Id.* at 2558.) She also stated that she leaves her home "sometimes if [her] legs are working." (*Id.*) She indicated that she was participating in physical therapy to strengthen her legs. (*Id.*)

Dr. Mauri's report of January 28, 2002 noted that Plaintiff continued to have back pain in the mid-thoracic area radiating down into her left leg with occasional giving way of her left leg. (*Id.* at 2559.) He also noted that she has been going to a new physical therapist which has given her some relief as well as using electrical stimulation. (*Id.*) Dr. Mauri gave her a prescription for a home TENS unit, Flexeril, and Relafen. (*Id.*)

In his Attending Physician's Supplemental Statement of March 28, 2002, Dr. Mauri noted a diagnosis of "thoracic disc herniations with spinal cord compression." (*Id.* at 2563.) He opined that Plaintiff had reached "Maximum Medical Improvement" and that she was "permanently and totally disabled" and would never recover sufficiently to return to work. (*Id.*) Dr. Mauri did not respond to any of the questions in the section labeled "FUNCTIONAL LIMITATIONS - ABILITIES." (*Id.*) Plaintiff points out that although Dr. Mauri did not complete this portion of the statement, there is ample other evidence in the record where Dr.

Mauri noted Plaintiff's functional limitations. (*See, e.g.*, R. at 114 (Apr. 22, 2002 letter of Dr. Mauri indicating that Plaintiff "cannot sit or stand for any significant period of time without having significant increased pain"); *id.* at 109 (Apr. 10, 2001 letter of Dr. Mauri indicating that Plaintiff "cannot sit or stand for more than thirty minutes without having to get up and move around. She also has a significant number of bad days where she is home unable to function at any capacity.").)

Thereafter, on April 3, 2002, GE Group Life received additional information from Plaintiff concerning her medical condition, including a one-page report from Plaintiff's physical therapist and a transcript from the Workers' Compensation Board hearing of September 28, 2001. (*Id.* at 2515, 2527-2548.) On April 5, 2002, GE Group Life received a one-page report from Plaintiff's physical therapist, which noted that Plaintiff's condition had improved, with restrictions on heavy loading on the spine. (*Id.* at 2515.)

### Dr. Hicks' April 2002 Report

GE Group Life then referred Plaintiff's claim to one of its medical doctor-consultants for a determination on Plaintiff's restrictions and limitations. (*Id.* at 2511.) On April 5, 2002, Thomas Hicks, M.D., GE Group Life's outside medical consultant, issued his report. Dr. Hicks noted, in pertinent part:

> After reviewing the provided records, it is my opinion that the claimant is not impaired to the point where it would prevent her from working. I believe that she is capable of performing sedentary occupation. Restrictions and limitations that I believe to be appropriate include limited walking, no climbing stairs/ladder, no bending/kneeling/squatting/stooping, no lifting greater than 5 lbs. and sit/stand/walk as tolerated, and no pushing or pulling.

(*Id.* at 2509.)

Dr. Hicks' notes indicate that he considered the February 24, 1999 report of Raphael P. Davis, M.D. a neurosurgeon who saw Plaintiff in consultation that day. (*Id.* at 2510, 677.) Dr. Davis reported that Plaintiff's MRI's showed "very modest degenerative disc disease primarily mid-thoracic and lower lumbar, none with neural compression." (*Id.* at 677.) He noted Plaintiff's complaints of "significant lower extremity weakness and shakiness" and that her "legs have given out on her on several occasions." (*Id.*) His examination revealed "good strength and sensation throughout the lower extremities with intact reflexes" and "no evidence of neural compression in her spine." (*Id.*) He concluded that he was "unsure as to the etiology of this woman's complaints" as he doubted "that what is seen on the MRI scan is of clinical significance." (*Id.*) He suggested performing an MRI of her brain and to look into Lyme disease. (*Id.*)

Dr. Hicks' notes also reflect that he reviewed the April 26, 2000 report of Robert L. Michaels, M.D., who examined Plaintiff on behalf of her workers' compensation carrier. (*Id.* at 2510, 498-500.) Based on his examination, Dr. Michaels reported: "I see no objective evidence to corroborate this patient's continued claims of disability. The patient has a mild disability based on subjective complaints. . . . I believe the patient can return to desk work, with no lifting of greater than 10 pounds, no climbing or other strenuous activity." (R. at 500.) His examination was on April 26, 2000.

***The Video Surveillance***

In an undated memorandum to the file, Jacque C. Cassella ("Cassella") from GE Group Life noted that his efforts to obtain Plaintiff's physical therapy records were apparently being thwarted by Plaintiff's rescission of her earlier signed authorization to release records. (*Id.*

at 361.)  He further noted that additional information had been received that cast some doubt on the veracity of Plaintiff's claims.[3]  Accordingly, Cassella noted that he was going to arrange for video surveillance to determine what Plaintiff's functional capabilities were.  (*Id.* at 362.)

On April 10, 2002, GE Group Life was informed by Plaintiff's physical therapist's office that Plaintiff had instructed it not to release any records to GE Group Life.  (*Id.* at 302.)  By letter dated April 12, 2002, Cassella wrote to Plaintiff noting, inter alia, the difficulties he had encountered in attempting to obtain her physical therapy records.  (*Id.* at 332.)  He advised her that if she continued to refuse to provide such records, GE Group Life would make a final determination regarding her eligibility based upon the medical information it had.  (*Id.* at 333.)

In late April 2002, GE Group Life received the reports and video tape of the surveillance of Plaintiff that it had arranged.  (*Id.* at 289-99.)  Over the course of three days (April 15, 17, and 19 of 2002), Plaintiff was videotaped running various errands, including carrying empty trash cans and dragging other trash cans, driving to physical therapy and the supermarket, picking up clothing from the dry cleaning, cleaning the front seat of her car while hunched over for approximately 10-15 minutes, using a garden hose, pushing a grocery cart filled with groceries and a plant, placing same into the trunk of her car, carrying the groceries into her house, driving to and entering Bloomingdale's, and returning to her car with a paper bag.  (*Id.* at 292-99.)

**Dr. Hicks' May 2002 Report**

---

[3]  Cassella refers to a newspaper article describing that Plaintiff had a choking incident at a restaurant on November 20, 2001.  In the article, it was reported that Plaintiff was planning a trip to Las Vegas and that she was a frequent customer of the diner.  (R. at 361.)

On May 9, 2002, Cassella from GE Group Life asked Dr. Hicks to review new information obtained since his prior review, which essentially consisted of the video surveillance.  On May 9, 2002, Dr. Hicks issued his report, which states, in pertinent part:

> Based on my review of the documentation in the file and my observation of the videotaped physical activities as I described above, there is clear inconsistency between the claimant's self-reported functional level that is documented in the file and the claimant's observed physical activities.  Based on the observed physical activities, it is my opinion that the claimant is capable of performing sedentary-light work.

(*Id.* at 280-280A.)

### *GE Group Life's Denial of Long-Term Benefits*

By letter dated May 10, 2002, Cassella advised Plaintiff that GE Group Life had determined that she was able to perform "sedentary to light work" and was therefore not eligible for long-term disability benefits beyond August 4, 2001, the date the definition of disability changed to "[a]ny [o]ccupation."  (*Id.* at 281-83.)  The denial letter relates that GE Group Life relied on Dr. Hicks' reports and the video surveillance in making its determination.  (*Id.* at 283.)

On September 6, 2002, Plaintiff formally appealed the denial of continued long-term disability benefits.   (*Id.* at 253-54.)  By letter dated December 17, 2002, GE Group Life stated as follows:

> There is no new information in our file that would lead us to change our decision to terminate your long-term disability claim. It remains our opinion that you are able to engage in a sedentary occupation.  Under the terms of the Plan, you have exhausted your administrative remedies.

(*Id.* at 71.)

### *The Instant Action*

On September 24, 2002, Plaintiff initiated the instant action. Her Complaint asserts three causes of action, viz. breach of contract, declaratory judgment that Plaintiff is totally disabled within the meaning of the Policy, and a violation of ERISA. Defendants have moved for summary judgment. For the reason stated below, their motion is granted in part and denied in part and this matter is remanded for further proceedings consistent with this opinion.

## DISCUSSION

I.    *Summary Judgment Standard*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine,*

*Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     *Plaintiff's Claim for Breach of Contract is Preempted by ERISA*

Defendants move for summary judgment on Plaintiff's first cause of action for breach of contract on the ground that this claim relates to an employee welfare benefit plan and

is thus preempted under ERISA. Plaintiff does not dispute that the Policy is an employee welfare benefit plan governed by ERISA and has failed to respond to Defendants' argument. For the reasons stated below, the Court finds that Defendants are correct.

ERISA provides employees with a private right of action to enforce the terms of employee welfare benefit plans, including plans that provide disability benefits. 29 U.S.C.A. § 1132. To guarantee uniformity in the enforcement of employee benefit plans, ERISA contains a sweeping preemption provision. Section 514(a) provides that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in . . . this title." 29 U.S.C. § 1144(a).

Here, Plaintiff's breach of contract claim arises out of state law and directly relates to the plan at issue, as it seeks to recover benefits that Plaintiff believes are owed to her under the plan. Accordingly, this claim is preempted by ERISA and must be dismissed. *See Kolasinski v. Cigna Healthplan of CT, Inc.*, 163 F.3d 148, 149 (2d Cir. 1998) (dismissing preempted state law claims for failure to pay benefits under plan); *Smith v. Dunham-Bush, Inc.*, 959 F.2d 6, 8, 11 (2d Cir. 1992) (finding that plaintiff's state law based breach of contract and tort claims were preempted by ERISA).

## III. Plaintiff's ERISA Claims

### A. Review of the Denial of Benefits is Governed by the Arbitrary and Capricious Standard

In *Firestone Tire and Rubber Co. v. Bruch*, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989); *see also*

-14-

*Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999). If such

discretion is given, a district court must review the administrator's denial of benefits

deferentially, and may reverse only if the arbitrator's decision was arbitrary and capricious. *See*

*id.*

Here, in Defendants' moving papers, Defendants proffer a copy of the purported

Policy at issue, together with an incorporated Certificate of Insurance. Defendants argue that a

provision in the Certificate explicitly grants Defendants discretionary authority to determine

entitlement to benefits. In her opposition papers, however, Plaintiff claims that the particular

pages of the Policy relied on by Defendants are inapplicable, citing various irregularities in the

appearance and substance thereof.

In their Reply papers, Defendants submit the affidavit of Pauline Michaud

("Michaud"), the Registrar of GE Group Life, formerly the Registrar for Phoenix Life. Michaud

attaches to her affidavit copies of what she contends is the correct Policy with incorporated

Certificate of Insurance, which were in effect at the time of Plaintiff's claimed date of disability,

February 5, 1999, and given to Reliance, Plaintiff's employer. (Michaud Aff. ¶ 3.) Michaud

explains in response to Plaintiff's assertions in her opposition papers that GE Group Life

reviewed the documents and realized that the Policy and Certificate furnished to Plaintiff in

discovery, and attached to Defendants' papers in support of their motion, did not contain the

correct Policy or Certificate. (*Id.* ¶ 4.) Although the newly submitted documents differ from the

ones previously produced, Michaud notes that both Certificates contain the identical

discretionary language. (*Id.* ¶ 5.)

The Policy that should have been provided in discovery, i.e., the correct Policy,

provides that Phoenix Life will provide the Employer with a Certificate of Insurance to be given to each employee which will explain the important features of the Policy and to whom Phoenix Life will pay benefits. (Attachment to Michaud Aff., Bates No. 2595.) It further provides that the Certificate(s) attached to the Policy are incorporated in, and made part of, the Policy. (*Id.* at 2592.) The new Certificate provides that Phoenix Life, as a fiduciary of the Administrator, "is charged with the obligation, and possesses discretionary authority to make claim, eligibility and other administrative determinations regarding these plans." (*Id.* at 2623.)

This provision clearly provides that Phoenix Life has the discretion to determine eligibility for benefits. The issue becomes, then, is it appropriate for the Court to consider such evidence given that it was raised for the first time in Defendants' Reply papers. In the exercise of discretion, the Court finds that it is. As an initial matter, the new documents directly respond to issues raised in Plaintiff's opposition papers. In addition, Plaintiff has made no claim that the new Policy and Certificate are inapplicable or that she wishes to submit additional evidence to refute the validity thereof. In this regard, she could have moved for leave to file a sur-reply but chose not to. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) ("[I]t is hard for [plaintiff] to claim unfair prejudice now, because she could have claimed surprise in the district court and sought to file a responsive sur-reply."); *Bayway Refining Co. v. Oxygenated Mktg. and Trading A.G.*, 215 F.3d 219, 226-27 (2d Cir. 2000) (district court properly relied on evidence submitted with moving party's reply, where, inter alia, record showed that opposing party knew such evidence could refute its claim but "chose not to introduce any evidence" of its own). Under these circumstances, the Court will consider the new documents in ruling on Defendants' motion. Given the clear language in the Certificate granting Phoenix Life the

discretionary authority to determine eligibility for benefits, the Court will apply the arbitrary and capricious standard of review to its denial thereof.

### B. *The Decision to Deny Benefits was Arbitrary and Capricious*

#### 1. *Definition of Applicable Standard*

Under the arbitrary and capricious standard of review, the Court may overturn a decision to deny benefits only if it is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler*, 181 F.3d at 249 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071, 1072 (2d Cir. 1995)).

This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker. *Pagan*, 52 F.3d at 442; *see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The court may not upset a reasonable interpretation by the administrator."). Thus, "[t]he question before a reviewing court under this standard is 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Jordan*, 46 F.3d at 1271 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)) (internal citation and quotation marks omitted).

#### 2. *The Decision to Deny Benefits*

Here, as noted above, Defendants paid Plaintiff long-term disability benefits for

the initial 24-month period. At the expiration thereof, the Policy definition of "Total Disability" changed from the inability to perform all the material and substantial duties of Plaintiff's regular occupation to the inability to perform the duties of any occupation. After an investigation, GE Group Life ultimately concluded that Plaintiff was no longer entitled to receive benefits:

> [I]t is our opinion you have the functional capacity to perform an occupation that you are qualified for or may become qualified for based on your education, training or experience.
>
> In addition, your observed activities are inconsistent with the activities reported to us in various written documents and telephone conversations. You have indicated in writing "I can't walk that much and at times my legs have no feeling and I fall. I need help around my home." You have been observed walking without restriction or assistance, driving on a regular basis, performing activities in the maintenance of your home and car, lifting and carrying objects and bending freely. This information has also been reviewed with our consulting physician and we believe it demonstrates your ability to perform sedentary to light work.
>
> Based on the investigation of your claim for benefits under this plan we have determined that you are not entitled to benefits beyond August 4, 2001, the date the definition of disability changed to Any Occupation, as you have not been disabled as defined in this plan since that date.

(R. at 283.)

### 3. *Plaintiff's Arguments*

Plaintiff challenges GE Group Life's decision on multiple grounds. Because the Court finds several of Plaintiff's arguments to be dispositive, the Court need not, and does not, address all of Plaintiff's arguments.

In making its determination, GE Group Life relied on the video surveillance as well as the opinion of Dr. Hicks, its consulting physician. Dr. Hicks, in turn, based his reports

on both the video surveillance and the medical record.  For the reasons stated below, the Court

finds that GE Group Life's denial of long-term benefits was arbitrary and capricious in that the

video surveillance together with Dr. Hick's opinion does not constitute substantial evidence to

support the conclusion that Plaintiff can perform sedentary work.  The Court will discuss them in

seriatim.

### a.    *The Video Surveillance*

In denying benefits and finding that Plaintiff could perform "sedentary to light

work," GE Group Life relied in large part on the video surveillance.  (R. at 283.)  Although

video surveillance tape may be instructive in comparing a claimant's behavior with her reported

limitations, *Billinger v. Bell Atl.*, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003), *aff'd*, 124 Fed.

Appx. 669 (2d Cir. 2005), "the information gleaned is not necessarily dispositive on its face and

must be considered within the context of the particular case."  *Glockson v. First Unum Life Ins.*

*Co.*, No. 7:04-CV-838, 1877140, 2006 WL  at *5 (N.D.N.Y. July 6, 2006).  As explained by the

Court in *Glockson*:

> There are extreme cases where the surveyed activity is so
> inconsistent with a claimant's reported limitations that a simple
> viewing of the surveillance constitutes substantial evidence. For
> example, in *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026,
> 1029 (8th Cir. 2000), a claimant who was disabled from working
> as a truck driver due to a herniated disc was videotaped moving
> about unimpaired, including unloading furniture.  That is not the
> case here.  Plaintiff's activities were not conclusively outside the
> range of activities of someone incapable of sedentary work.

*Id.*

The same is true in the instant case.  Here, the activities recorded on the video

tapes are not entirely inconsistent with Plaintiff's reported limitations as noted in her own

statements as well as the reports of Dr. Mauri, her treating physician. For example, Plaintiff stated that she could leave her home and drive occasionally if her legs were working. Dr. Mauri also indicated that she could walk with a shopping cart but could not sit or stand for significant periods of time because her legs would likely give out. The fact that Plaintiff engaged in a few hours of activities on three separate days does not belie the evidence indicating that she cannot perform sedentary work. This is especially true considering that the "generally recognized definition of [sedentary] work" is work which involves "'two hours of standing or walking and six hours of sitting in an eight-hour work day.'" *Connors v. Ct. Gen. Life Ins. Co.*, 272 F.3d 127, 136 n.5 (2d Cir. 2001) (quoting Soc. Sec. Rul. 83-10; applying definition in ERISA case) (emphasis omitted). There is nothing in GE Group Life's decision which even suggests that it considered this definition and the activities taped are simply not that probative, much less conclusive, as to Plaintiff's ability to perform sedentary work as that term has been generally defined. *Cf. Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals, such as attending church and helping his wife on occasion go shopping for their family, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.") (internal quotation marks and citation omitted); *see also Glockson*, 2006 WL 1877140 at *7 ("[T]he surveillance [does not] reveal anything about any subsequent pain or fatigue due to the drive-or the outings as a whole for that matter. Reliance on snapshot evaluations, like surveillance, is logically suspect in assessing conditions which result in debilitating pain and/or fatigue following periods of activity.").

**b.      *Dr. Hicks' Review of the Medical Evidence***

In April 2002, Dr. Hicks opined that Plaintiff was capable of performing sedentary work. (R. at 2509.) This determination was based on his review of the medical record. In May 2002, Dr. Hicks proffered a second opinion, this time based additionally on the video surveillance, and similarly opined that Plaintiff could perform "sedentary to light work." (*Id.* at 283.)

As best the Court can glean from Dr. Hicks' April 2002 hand-written report, in making his recommendation that benefits be denied, he relied on the February 1999 report of Dr. Davis and the April 2000 report of Dr. Michaels, both of which were discussed above. Essentially, in February 1999, Dr. Davis reported that Plaintiff exhibited "very modest degenerative disc disease" and that he was "unsure as to the etiology of [Plaintiff's] complaints." (R. at 677.) In April 2000, Dr. Michaels reported that Plaintiff has a "mild disability" and saw "no objective evidence to corroborate [Plaintiff's] continued claims of disability." (*Id.* at 500.)

In relying on this evidence, Dr. Hicks apparently rejected multiple reports issued by Dr. Mauri, Plaintiff's treating physician, from January 2002 through April 2002, as well as Plaintiff's Supplemental Statement dated March 14, 2002, indicating that she "can't walk that much and at times [her] legs have no feeling and [she] fall[s]" and that she leaves her home "sometimes if [her] legs are working." (*Id.* at 2558.)

In *Black & Decker Disability Plan v. Nord.*, 538 U.S. 822 (2003), the Supreme Court held that unlike cases for Social Security benefits, ERISA does not require plan administrators to accord special deference to the opinions of treating physicians. *Id.* at 834. "[N]or may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.*

Although Dr. Hicks was not required to accord Dr. Mauri's opinions special weight, it cannot be said that Dr. Hicks' April 2002 rejection of Dr. Mauri's 2002 reports was based on "reliable evidence" when the evidence relied upon consisted of one medical report from February 1999 and another from April 2000. GE Group Life could have directed Plaintiff to submit to an updated independent physical examination but it declined to do so. In addition, Dr. Hicks wholly failed to consider Plaintiff's recent complaints of pain. "It has long been the law of this Circuit that the 'subjective element of pain is an important factor to be considered in determining disability.'" *Connors*, 272 F.2d at 136 (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)). Although it is not unreasonable for an insurer to credit objective evidence over subjective evidence, the objective evidence relied on by Dr. Hicks was over two years old.

In sum, the Court that the video surveillance together with Dr. Hick's opinion does not constitute substantial evidence to support the conclusion that Plaintiff can perform sedentary work.

### 4.   *The Demirovic Decision*

Another error underlying the determination was GE Group Life's failure to assess Plaintiff's ability to perform particular work. In *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, the Second Circuit held that an Administrator's review of a claimant's "total disability" application under ERISA must consider the claimant's ability to pursue gainful employment in light of all the circumstances and that this includes a consideration of what type of employment a claimant actually remains capable of performing. 467 F.3d 208, 213-15 (2d Cir. 2006). The court found that "[a] finding that a claimant is physically capable of sedentary work is meaningless without some consideration of whether she is vocationally qualified to obtain such

employment, and to earn a reasonably substantial income from it, rising to the dignity of an income or livelihood, though not necessarily as much as she earned before the disability." *Id.* at 215.

As in *Demirovic*, "[t]he record here . . . shows a complete absence of consideration of [Plaintiff's] vocational circumstances. This record cannot pass muster even under the deferential arbitrary and capricious standard of review." Accordingly, for this independent reason, the Court finds that the decision to deny benefits is not supported by the substantial evidence.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED to the extent that Plaintiff's state law claims are dismissed. With regard to Plaintiff's ERISA claims, the motion is DENIED and the matter is remanded to GE Group Life for further proceedings consistent with this opinion. Under *Demirovic*, GE Group Life must consider both whether Plaintiff is physically capable of obtaining employment from which she may earn a reasonably substantial income and whether she is vocationally qualified to obtain such employment. *See Demirovic*, 467 F.3d at 215. While GE Group Life need not employ a particular method to make this determination, its conclusion must satisfy a reviewing court that consideration of the claimant's circumstances was not arbitrary and capricious. *Id.* In addition, although the Court's review was confined to the administrative record, upon remand, GE Group Life should look at any additional materials submitted by Plaintiff in support of her application. *See Miller*, 72 F.3d at 1073 (where court concludes possibility exists that claim could be denied upon receipt of additional evidence, proper course is to remand with instructions to consider

additional evidence).  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.
        March 23, 2007

/s
Denis R. Hurley,
United States District Judge